IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NephroGenex, Inc.,[1]<br><br>　　　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 16-11074 (KG)<br><br>Hearing Date:  6/2/16 at 2:00 p.m. (ET)<br>Obj. Deadline:  5/25/16 at 4:00 p.m. (ET)<br><br>Re:  Dkt No. 35 |

**OBJECTION OF THE AD HOC COMMITTEE OF EQUITY SECURITY HOLDERS TO DEBTOR'S APPLICATION FOR ORDER (I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF CASSEL SALPETER & CO., LLC AS INVESTMENT BANKER TO THE DEBTOR, NUNC PRO TUNC TO THE PETITION DATE, AND (II) WAIVING CERTAIN REPORTING REQUIREMENTS PURSUANT TO LOCAL RULE 2016-2**

　　　　The Ad Hoc Committee of Equity Security Holders (the "Ad Hoc Equity Committee")[2] of NephroGenex, Inc. ("NRX," or the "Debtor") by and through its undersigned counsel, hereby submits this objection (this "Objection") to the *Debtor's Application for Order (I) Authorizing the Retention and Employment of Cassel Salpeter & Co., LLC as Investment Banker to the Debtor, Nunc Pro Tunc to the Petition Date, and (II) Waiving Certain Reporting Requirements Pursuant to Local Rule 2016-2* [D.I 35] (the "Retention Application")[3] and respectfully represents as follows:

**PRELIMINARY STATEMENT**

　　　　1.　Simply put, Cassel Salpeter & Co., LLC ("Cassel Salpeter") should not be entitled to an unchecked success fee in the event of any disposition of the Debtor's assets, without regard to the nature and extent of Cassel Salpeter's efforts in that regard.  In its current form, the fee

---

[1] The last four digits of the Debtor's federal tax identification number are 5171.  The mailing address for the Debtor is 3200 Beechleaf Court, Suite 900, Raleigh, NC  27604.
[2] The Ad Hoc Equity Committee is comprised of Glenn C. Pollack and Mark D. Thompson Trust.
[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Retention Application.

paid to Cassel Salpeter could be entirely disproportionate to the value obtained in connection with the disposition of the Debtor's assets. For example, if any Sale Transaction nets less than $1 million for the Debtor's estate, Cassel Salpeter will earn ***a commission in excess of 50%*** of the total sale consideration. On the other hand, if the Debtor earns $100 million for its assets, Cassel Salpeter will be entitled to ***$3.5 million*** (even if the sale is accomplished by some other means, without Cassel Salpeter's involvement), an unwarranted windfall in light of the services to be provided to the Debtor.

2. The proposed Sale Transaction Fee will be earned and payable even if such Sale Transaction is completed solely for the benefit of the Debtor's professionals, with no recovery to any other creditors. In the absence of any indication of the sale price that the Debtor expects to achieve for its assets, the proposed fee to be paid to Cassel Salpeter is unjustified and risks causing material prejudice to the parties in interest in this case.

3. Moreover, the Ad Hoc Equity Committee has serious reservations regarding Cassel Salpeter's ability to market and sell pharmaceutical intellectual property rights. The Debtor has not provided any evidence of Cassel Salpeter's prior engagements, or of the types of matters that have been handled by Cassel Salpeter's professionals prior to joining that firm. Marketing and selling intellectual property and pharmaceuticals is a complex task; the Debtor has offered no reason to believe Cassel Salpeter is up to that assignment.

## BACKGROUND

4. NRX's principal assets are its rights relating to the oral formulation of Pyridorin® (collectively, the "Pyridorin Assets"). *See Declaration of John P. Hamill in Support of Chapter 11 Petition and First Day Pleadings* [D.I. 4] ("Hamill Decl.") at ¶ 8.

5. Over the past several years, NRX has struggled to bring Pyridorin to market and

has failed to turn a profit. *See id*. at ¶¶ 13-16.

6. In August 2015, MTS Health Partners, L.P. ("MTS") began providing financial advisory services to NRX, including the assessment of strategic alternatives. *Id*. at ¶ 18. The terms of NRX's retention of MTS have not been disclosed, nor has the Debtor explained the work performed by MTS during its engagement.

7. On February 22, 2016, NRX elected to suspend its clinical program and to reduce its workforce by approximately 50%. *Id*. at ¶ 18.

8. On February 23, 2016, in connection with the exploration of the aforementioned potential "business alternatives" (as to which MTS had been advising NRX), NRX paid East West Bank, its secured lender, approximately $6.3 million. *Id*. at ¶ 18.

9. NRX then terminated both its President/CEO and its Chief Scientific Officer, effective April 13, 2016. *Id*. at ¶ 19. Those executives continue to serve the Debtor pursuant to separate consulting agreements, the terms of which have not been disclosed. *Id*.

10. Approximately two weeks later, NRX entered into an agreement to retain Cassel Salpeter as investment banker in connection with the sale of NRX's assets.

11. One day later, on April 30, 2016, (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is operating its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12. No trustee has been appointed in this chapter 11 case, nor has an official committee of unsecured creditors been formed.

13. On May 11, 2016, the Debtor filed the Retention Application, pursuant to which it seeks authorization to retain Cassel Salpeter as investment banker to the Debtor, *nunc pro tunc* to

- 3 -
75689208.5

the Petition Date, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code.

14. The terms of Cassel Salpeter's engagement are set forth in an "Investment Banking Agreement," dated April 29, 2016 (the "<u>Agreement</u>"), a copy of which was attached to the Retention Application [D.I. 35-3]. One day prior to the Petition Date, NRX paid Cassel Salpeter $50,000, the first of four installments of an "<u>Initial Fee</u>" in the amount of $137,500. According to the Agreement, the Initial Fee is payable regardless of whether Cassel Salpeter is able to accomplish any transaction for the benefit of the Debtor.

15. On May 25, 2016, the Ad Hoc Equity Committee requested that the United States Trustee (the "<u>U.S. Trustee</u>") appoint an official committee of equity security holders. A copy of such request is attached hereto as **Exhibit A**.

16. The Debtor has represented that undisputed unsecured claims in this case aggregate to ***no more than $1.7 million***. *See* Petition, at Official Form 204. The Debtor has also stated that it has cash in excess of $4.5 million, before taking non-cash assets into account. *See, e.g., Debtor's Motion for Order Authorizing Continued Use of Existing Bank Accounts and Business Forms* [D.I. 5] ¶ 7. Even if all disputed claims were allowed in full, the Debtor would be able to make a distribution to equity in the event that it can realize ***just $1.5-$2 million from the sale of its assets***. *See* Petition, at Official Form 204. The very fact that no official committee of unsecured creditors has been appointed (due to lack of interest) further corroborates the widely-held belief that unsecured creditors will be paid in full.

17. If the Debtor is correct in representing that any "plan of reorganization or liquidation will likely result in holders of the Company's capital stock receiving no distribution on account of their interests[,]"[4] then that must necessarily mean that there is little to no value to be had from the sale of the Pyridorin Assets. If that is the case, there is no use to continuing this

---

[4] *See* NRX 8-K, dated May 20, 2016.

chapter 11 case on the course that the Debtor has charted, and either (i) saddling the estate with $568,750 in administrative expenses in exchange for what may be a slight incremental return for creditors or (ii) incurring $137,500 in administrative expenses for no discernible purpose.

18. On the other hand, even the most conservative valuation of the assets to be sold would suggest a value somewhere north of $2 million,[5] in which case the equity security holders of NRX are the true stakeholders in this chapter 11 case and should be given due consideration and consultation in connection with the retention of an investment banker to market the Pyridorin Assets.

**OBJECTION**

I. **The Proposed Fees to Be Paid to Cassel Salpeter Are Excessive**

19. The Retention Application provides that Cassel Salpeter will be paid the Initial Fee in the amount of $137,500, regardless of whether a transaction can be consummated. In the event of a successful Sale Transaction, Cassel Salpeter will be paid a Sale Transaction Fee in the amount of the *greater* of (i) $500,000 and (ii) 3.5% of the Sale Consideration.[6]

20. There is no cap or other limitation on the Sale Transaction Fee, and Cassel Salpeter's commission could be entirely disproportionate with the services being rendered and/or the value being obtained for the Debtor's assets. Consequently, the success fee to be paid to Cassel Salpeter (for what could be very little work) would be unprecedented. Moreover, because "Sale Transaction" is so broadly defined (and the attendant fees will be earned even if the Debtor effects such a sale without outside assistance within twelve months after the expiration of the Agreement), Cassel Salpeter stands to earn an exorbitant fee even in the event that it does

---

[5] If the Debtor itself valued its assets at any lower amount, Cassel Salpeter's fee for a successful transaction would be **in excess of 28% of the total transaction value** – a clear waste of the Debtor's assets. The Debtor's *Schedules of Assets and Liabilities* [D.I. 42] ascribe a value of $0 to the Pyridorin Assets because their value in "unknown."
[6] In the event of a Sale Transaction, 50% of the Initial Fee will be credited against the sum to be paid to Cassel Salpeter. As noted, however, the proposed fee structure remains unreasonable.

- 5 -

nothing to help the Debtor to market and sell its assets. It is unreasonable to award what might be a massive fee for nothing more than the Debtor having confirmed a liquidating plan that turns Pyridorin and the Debtor's other assets over to creditors and/or equity holders, with no incremental benefit whatsoever to the Debtor's stakeholders.

21. On the other hand, there is also no "floor" to the value of any Sale Transaction that could give rise to the Sale Transaction Fee. If, for example, the sale nets only enough to help cover the costs of the Debtor's professionals (to say nothing of unsecured creditors), Cassel Salpeter will walk away with *$568,750 in cash*, all at the expense of the true parties in interest in this case.

22. The Ad Hoc Equity Committee's concerns are magnified by the fact that neither the Debtor nor Cassel Salpeter has offered any explanation of the marketing and sale process that they propose to undertake. Indeed, the Debtor had already retained MTS to explore various strategic alternatives, to no avail. The Debtor has not explained how Cassel Salpeter will avoid duplicating MTS's work, or whether there is anything to be gained or learned from those prior efforts.

23. The Committee therefore objects to the Retention Application because the proposed Sale Transaction Fee does not satisfy the reasonableness standard for approval under section 328(a) of the Bankruptcy Code.

24. Section 328(a) of the Bankruptcy Code provides that

> (a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, *on any reasonable terms and conditions of employment*, including on a retainer, on an hourly basis, on a fixed percentage or fee basis, or on a contingent fee basis. . .

11 U.S.C. § 328(a) (emphasis added).

25. The analysis for approval of retention terms under section 328(a) focuses on the

- 6 -

reasonableness of such terms. Establishing reasonable compensation in connection with Cassel Salpeter's retention is critical at the outset because retention pursuant to section 328(a) "fix[es] … such terms and conditions" of employment which will not be modified by the Court unless "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of approval." 11 U.S.C. § 328(a).

26. Moreover, courts may look to the criteria set forth in section 330(a) to analyze the "reasonableness" of proposed compensation under section 328(a). *See*, *e.g.*, *Committee of Equity Sec. Holders of Federal-Mogul Corp. v. Official Comm. of Unsec. Creditors (In re Federal Mogul-Global, Inc.)*, 348 F.3d 390, 407 (3d Cir. 2003) (Alito, J.).

27. Here, the Debtor has offered no indication of the value that it expects to gain from the sale of its assets. If that value is lower than the Ad Hoc Equity Committee expects, it is unreasonable to burden the Debtor with a $568,750 administrative expense for little to no value for the estate. If, on the other hand, there is significant value to be had for the Debtor's assets, it makes no sense to provide Cassel Salpeter with an unfettered opportunity to realize ***millions of dollars in fees*** (at equity's expense) for what may be very little work performed on the Debtor's behalf.

28. Other than asserting that Cassel Salpeter's fee structure is reasonable and "consistent with" similar compensation arrangements, and that it was negotiated at arm's length (Retention Application at ¶¶ 16, 23), neither the Debtor nor Cassel Salpeter has provided sufficient information to demonstrate the reasonableness of the Transaction Fee, including the time spent (or to be spent) trying to generate interest and proposals from any potential bidders. Further, there is no information in the Retention Application demonstrating that the proposed fee structure is consistent with customary compensation in similar chapter 11 cases. *See* 11 U.S.C.

§ 330(a)(3)(a) and (f).

29. In *Federal Mogul*, the Third Circuit remanded the matter to the bankruptcy court because the record did not contain clear evidence of reasonableness. 348 F.3d at 407. The Debtor should similarly be held to its burden of demonstrating the reasonableness of the proposed fee structure, particularly because there are no controls in place to ensure that the fee structure will not render an inequitable result.

## II. The Debtor Has Not Shown that Cassel Salpeter Is Qualified to Serve as its Investment Banker

30. The Ad Hoc Equity Committee also has material reservations regarding Cassel Salpeter's ability to market the Pyridorin Assets and to maximize the value of the Debtor's assets.

31. The Debtor offers only conclusory and unsupported statements regarding Cassel Salpeter's qualifications. The only purported evidence of those qualifications is in the form of statements by James S. Cassel that his colleague, Ira Leiderman, had been the head of various "Healthcare Groups" at other advisory firms. *See* Cassel Application (Declaration of James S. Cassel) at ¶ 6. No further qualifications are stated, nor is there any explanation of what Mr. Leiderman did in those capacities. Nor is there any description of any of Cassel Salpeter's professionals having had any experience marketing and selling pharmaceutical intellectual property such as the Pyridorin Assets.

32. Moreover, an independent review of the Cassel Salpeter website shows very few if any transactions involving a drug-development company, the core subject matter here. *See* http://casselsalpeter.com/experience/recent-transactions/ (last accessed May 23, 2016).

33. Absent sufficient support for Cassel Salpeter's qualifications, the Retention Application should not be approved.

75689208.5

### III. In the Alternative, Equity Security Holders Should Be Entitled to Review and Object to Cassel Salpeter's Fees and Expenses

34. Even assuming, *arguendo*, that Cassel Salpeter were qualified to serve as the Debtor's investment banker and that its proposed fee structure is reasonable, the payment of any fees and expenses to Cassel Salpeter should be expressly made subject to scrutiny by the Ad Hoc Equity Committee (or any official Equity Committee that may be appointed in this case).

35. Indeed, the Debtor expressly notes that the U.S. Trustee shall retain the right to object to Cassel Salpeter's fee applications pursuant to the standard of review set forth in Section 330 of the Bankruptcy Code. But the Debtor anticipates no such review by the parties who are actually funding estate professionals' fees and expenses. Even if some moderately reasonable fee structure were being proposed, the true stakeholders in this case should be afforded similar review rights as those expressly reserved for the U.S. Trustee.

36. Consequently, the Ad Hoc Equity Committee should have the right to object to the reasonableness of any compensation or expense reimbursement to be paid to Cassel Salpeter, consistent with Section 330 of the Bankruptcy Code.

### CONCLUSION

37. The Ad Hoc Equity Committee understands the importance of retaining competent advisors to help the Debtor to market and sell its assets. Nevertheless, the Debtor has failed to demonstrate that (i) Cassel Salpeter is up to the task or (ii) the proposed fee structure is reasonable under the circumstances.

38. The Ad Hoc Equity Committee believes that the Debtors can retain a qualified investment banker without binding the estate to either (i) a $568,750 administrative expense in exchange for no value whatsoever or (ii) a massive reduction in the proceeds of any sale of the Debtor's assets, even if the Debtor does nothing more than assign its assets to its creditors or its

equity security holders.

39. The Ad Hoc Equity Committee therefore respectfully requests that the Court deny the Retention Application and grant the Ad Hoc Equity Committee such other and further relief as the Court deems just and proper.

DATED: May 25, 2016

        Respectfully submitted,

        **THE ROSNER LAW GROUP LLC**

        */s/ Frederick B. Rosner*
        Frederick B. Rosner, Esq. (DE 3995)
        824 Market Street, Suite 810
        Wilmington, DE 19801
        (302) 777-1111
        rosner@teamrosner.com

-and-

        H. Jeffrey Schwartz
        Doron P. Kenter
        **ROBINS KAPLAN LLP**
        601 Lexington Avenue
        Suite 3400
        New York, NY 10022
        Tel: (212) 980 7400
        Fax: (212) 980 7499

        *Attorneys for the Ad Hoc Committee of Equity Security Holders*