**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| NEPHROGENEX, INC., | : | Case No. 16-11074 (KG) |
| Debtor.[1] | : | **Hearing Date: 2/24/2017 at 10:00 a.m. (ET)**<br>**Objection Deadline: 2/15/2017 at 4:00 p.m. (ET)** |

**DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO PLAN SUPPORT AGREEMENT WITH MEDPACE, INC.**

NephroGenex, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), hereby moves (the "Motion") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's entry into that certain Plan Support Agreement (the "PSA"), by and between the Debtor and Medpace, Inc. ("Medpace"), a copy of which is attached to the proposed order submitted herewith as Exhibit 1. In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code. Such relief also is warranted under Bankruptcy Rule 6004.

[1] The last four digits of the Debtor's federal tax identification number are 5171. The mailing address for the Debtor is 3200 Beechleaf Court, Suite 900, Raleigh, NC 27604.

## BACKGROUND

### A. The Chapter 11 Case

3. On April 30, 2016 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The factual background regarding the Debtor, including its business operations, capital structure and debt structure, and the events leading to the filing of the Chapter 11 Case, is set forth in detail in the Declaration of John P. Hamill in Support of Chapter 11 Petition and First Day Pleadings [Docket No. 4] (the "First Day Declaration").

4. The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. To date, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Case.

6. On August 31, 2016, the Debtor filed a motion seeking approval of, among other things, bidding procedures applicable to a sale of substantially all of its assets [Docket No. 147] (the "Bidding Procedures Motion"). On November 14, 2016, having received no Qualified Bids by the Bid Deadline (as such terms are defined in the Bidding Procedures Motion), the Debtor filed the Notice of Cancellation of Auction and Related Sales Process [Docket No. 227] (the "Notice of Sale Cancellation").

7. On December 16, 2016, the Debtor filed a plan of liquidation [Docket No. 255] (the "Liquidating Plan") and the related Disclosure Statement [Docket No. 256] (the "Disclosure Statement").

**B. The Circumstances Leading to the Liquidating Plan**

8. The Debtor is a clinical-stage pharmaceutical company focused on developing therapeutics to treat kidney diseases. The Debtor's product pipeline includes an oral formulation of Pyridorin® (pyridoxamine dihydrochloride) ("Pyridorin"), which was being developed as a chronic, therapeutic agent to slow the progression of diabetic nephropathy, a common complication of diabetes. In 2014, Pyridorin entered into a Phase 3 program known as PYR-311 (the "Phase 3 Study") to evaluate the safety and efficacy of Pyridorin in subjects with nephropathy due to type 2 diabetes. On February 22, 2016, due to financial considerations, the Debtor's Board of Directors made the determination to pause the Phase 3 Study. Approximately two months later, the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.

9. As described in the First Day Declaration, the Debtor filed for chapter 11 protection to preserve the Debtor's remaining assets and implement a process to sell substantially all of its assets, including all of its intellectual property relating to Pyridorin, to maximize the value of the Debtor's estate for the benefit of its creditors and other constituents.

10. On May 27, 2016, the Debtor submitted a motion to authorize the unblinding of clinical trial data from the Phase 3 Study [Docket No. 62] (the "Unblinding Motion") with the expectation that, if the clinical trial data showed positive results (as expected), the Debtor would generate greater interest in the sale of its intellectual property—and the resulting sale price would be materially higher. On June 14, 2016, the Court entered an order [Docket No. 93] approving the Unblinding Motion. Unfortunately, based on the unblinded data from the terminated Phase 3 study, there was no statistically significant difference in the change from baseline between the Pyridorin patient group and the placebo patient group at months six, nine and twelve.

11. Despite this setback, several parties remained interested in the Debtor's assets, and the Debtor continued its sale and marketing process. In the end, however, no party submitted a Qualified Bid for the Debtor's assets, and the Debtor formally terminated its sale process on November 14, 2016.

12. After that, in an effort to move the Chapter 11 Case quickly forward toward a conclusion, the Debtor filed the Liquidating Plan on December 16, 2016. As disclosed in Exhibit B to the Disclosure Statement, the Debtor projected that, under the Liquidating Plan, the Debtor's unsecured creditors would receive distributions equal to 26.8% to 37.1% of the allowed amounts of their claims.

**C. The PSA and the Contemplated Plan of Reorganization**

13. In early January, several weeks after filing the Liquidating Plan and related Disclosure Statement, the Debtor received a draft plan term sheet from Medpace that contemplated a restructuring of the Debtor through a chapter 11 plan of reorganization. After several weeks of good faith, arm's-length negotiations, the Debtor and Medpace have agreed upon the material terms of a plan of reorganization (the "Plan"), and have embodied those terms in the chapter 11 Plan Term Sheet (the "Term Sheet") attached to the PSA as Exhibit A.

14. The Term Sheet contemplates a plan of reorganization pursuant to which Medpace would waive its cash distribution and exchange its unsecured claim against the Debtor in the amount of $4,312,698.51 (the "Medpace Claim") for 100% of the newly-issued equity in the reorganized Debtor. The Medpace Claim is by far the largest claim against the Debtor's estate and comprises at least 65% of the unsecured claims pool. As a result of the contemplated restructuring, the Debtor's unsecured creditors are projected to receive a 39.4% to 57.7%

recovery on their claims—which is a material improvement over the projected recovery under the Debtor's Liquidating Plan.

15. In order to induce the Debtor to withdraw its Liquidating Plan and proceed with the alternative restructuring transaction proposed by Medpace and embodied in the Term Sheet, Medpace agreed to enter into the PSA with the Debtor. Under the PSA, Medpace has agreed, among other things, to support and take all reasonable actions necessary or reasonably requested by the Debtor to obtain approval of a plan of reorganization with terms consistent with those set forth in the Term Sheet. See PSA at §§ 3, 4.1(a)(2). Moreover, both the Debtor and Medpace have agreed pursuant to the PSA to negotiate in good faith all of the documents and transactions described in the Term Sheet and the PSA. See PSA at § 5(a).

16. Beyond these general terms, the PSA contains various other customary terms and conditions, the most significant of which are summarized below:[2]

| | |
|---|---|
| Debtor's Affirmative Covenants | Subject to the terms and conditions of the PSA, and for so long as the PSA has not been terminated in accordance with its terms, the Debtor agrees to comply with the following covenants:<br><br>1. Comply with the terms of the Term Sheet and the PSA and use commercially reasonable efforts to take all actions necessary to carry out the terms of the Term Sheet and the PSA;<br><br>2. Use commercially reasonable efforts to file, by February 13, 2017, a Plan and disclosure statement acceptable to Medpace;<br><br>3. Obtain any and all required regulatory and/or third-party approvals for the restructuring embodied in the Plan;<br><br>4. (a) Continue to operate the Debtor's business in compliance with all applicable laws (except for certain SEC reporting |

[2] The descriptions of the terms of the PSA provided in the Motion are intended only as a summary. In the event of any inconsistency between the descriptions set forth herein and the terms of the PSA, the terms of the PSA shall govern.

| | |
|---|---|
| | requirements), (b) maintain the Debtor's books and records, (c) upon request, provide Medpace with financial information and reasonable access to the Debtor's books and records, (d) not take any action outside the ordinary course of business without approval from the Bankruptcy Court or consent from Medpace (which consent will not be unreasonably withheld), and (e) timely pay any and all required fees and taxes;<br><br>5. Not take any action that is inconsistent with the approval of the disclosure statement, the solicitation of votes on the Plan, and the confirmation of the Plan;<br><br>6. Provide draft copies of all material motions or applications and other material documents the Debtor intends to file with the Court to Medpace;<br><br>7. Object to any motion filed with the Court by a third party seeking the entry of an order (a) appointing an examiner with expanded powers or a trustee, (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) dismissing the Chapter 11 Case;<br><br>8. Provide prompt written notice to Medpace of (a) the occurrence, or failure to occur, of any event that, to the Debtor's knowledge, would be likely to cause (1) any representation or warranty of the Debtor contained in the PSA to be untrue or inaccurate in any material respect, (2) any covenant of the Debtor contained in the PSA not to be satisfied in any material respect or (3) any condition precedent contained in the Plan, the Term Sheet or the PSA not to occur or become impossible to satisfy, (b) the receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the restructuring, (c) the receipt of any written notice from any governmental body in connection with the PSA or the transactions contemplated by the restructuring, (d) the receipt of any written notice of any proceeding commenced, or, to the knowledge of the Debtor, threatened against the Debtor, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the restructuring, and (e) any failure of the Debtor to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under the PSA; |

| | |
|---|---|
| | 9. Use commercially reasonable efforts to prosecute confirmation of the Plan;<br><br>10. Use commercially reasonable efforts to obtain confirmation of the Plan by entry of an order of the Court (which order shall be in form and substance acceptable to Medpace) as soon as reasonably practicable and in no event later than May 17, 2017;<br><br>11. Use commercially reasonable efforts to satisfy all conditions to the effectiveness of the Plan and consummate the Plan as soon as reasonably practicable and in no event later than May 31, 2017;<br><br>12. Use commercially reasonable efforts to, within five business days after execution of the PSA, file a motion seeking entry of an order approving the Debtor's entry into the PSA; and<br><br>13. Promptly notify Medpace in writing following the receipt in writing of any notice of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which would reasonably be anticipated to have a material adverse effect on the Term Sheet or the Plan.<br><br>See PSA at § 4.2(a). |
| Debtor's Negative Covenants | Subject to the terms and conditions of the PSA, and for so long as the PSA has not been terminated in accordance with its terms, the Debtor shall not, directly or indirectly, permit to occur any of the following:<br><br>1. Modify the Plan, in whole or in part, in a manner that is materially inconsistent with the PSA or the Term Sheet, absent the written consent of Medpace;<br><br>2. Take any action that is materially inconsistent with the PSA or the Term Sheet, or that would delay or obstruct the proposal, solicitation, confirmation or consummation of the Plan;<br><br>3. Amend or modify (other than technical, non-substantive modifications, which changes shall not in any event be adverse to Medpace) the Term Sheet or the Plan, absent the written consent of Medpace; |

| | |
|---|---|
| | 4. File any motion or pleading with the Court that, in whole or in part, is not consistent in any material respect with the PSA, the Term Sheet or the Plan;<br><br>5. Move for an order from the Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;<br><br>6. Amend or propose to amend the Debtor's certificate or articles of incorporation, bylaws or comparable organizational documents, unless done so in accordance with the Plan;<br><br>7. Issue, sell, pledge, dispose of or encumber, redeem, purchase or acquire any security;<br><br>8. Incur any capital expenditures other than in the ordinary course of business, in the amounts consistent with historical business practices, and without the advance consent of Medpace;<br><br>9. Incur or suffer any material indebtedness;<br><br>10. Hire any executive or employee without the express consent of Medpace;<br><br>11. Allow or settle claims or any pending litigation not otherwise insured under the Debtor's insurance policies and paid for by the Debtor's applicable insurance carrier, absent the written consent of Medpace (such consent not to be unreasonably withheld); and<br><br>12. Withdraw or revoke the Plan or publicly announce the Debtor's intention not to pursue the Plan.<br><br><u>See</u> PSA at § 4.2(b). |
| <u>Mutual Representations, Warranties and Covenants</u> | Each of the Debtor and Medpace make the following representations, warranties and covenants to the other party, each of which are continuing representations, warranties and covenants:<br><br>1. Each party agrees to negotiate in good faith all of the documents and transactions described in the Term Sheet and in the PSA; |

| | |
|---|---|
| | 2. Each party is validly existing and in good standing under the laws of the state or other jurisdiction of its organization or under the Bankruptcy Code, and the PSA is a legal, valid and binding obligation of such party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;<br><br>3. Except as expressly provided in the PSA, each party has all requisite direct or indirect power and authority to enter into the PSA and to carry out the Plan contemplated by, and perform its respective obligations under, the PSA;<br><br>4. The execution and delivery of the PSA and the performance of its obligations under the PSA have been duly authorized by all necessary action on the part of each party and no consent, approval or action of, filing with or notice to any governmental or regulatory authority is required in connection with the execution, delivery and performance of this Agreement (except, with respect to the Debtor, approval of the Court);<br><br>5. The execution, delivery, and performance of the PSA does not and shall not: (a) violate any provision of law, rule or regulations applicable to it; (b) violate its certificate of incorporation, bylaws (or other formation documents in the case of a limited liability company), if any; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;<br><br>6. Each party has been represented by legal counsel of its choosing in connection with the PSA and the transactions contemplated by the PSA, has had the opportunity to review the PSA with its legal counsel and has not relied on any statements made by any other party or its legal counsel as to the meaning of any term or condition contained in the PSA or in deciding whether to enter into the PSA or the transactions contemplated thereby; and<br><br>7. Each party is unaware of: (i) the existence of any secured claims in the Debtor's Chapter 11 Case, other than the secured claim asserted by Canon Financial Services, Inc. (Claim No. 65); and (ii) any material unpaid tax liabilities.<br><br>See PSA at § 5. |

| | |
|---|---|
| Debtor's "Fiduciary Out" | Nothing in the PSA shall prevent the Debtor from taking or failing to take any action that it is obligated to take (or not take, as the case may be) in the performance of any fiduciary duty or as otherwise required by applicable law which the Debtor owes to any other person or entity under applicable law. See PSA at §§ 4.2(b), 6.2(c). |
| Medpace Termination Events | Medpace may terminate its obligations and liabilities under the PSA upon three business days prior written notice, upon the occurrence and continuation of any of the following events:<br><br>1. the Debtor does not execute the PSA on or before February 1, 2017;<br><br>2. the Debtor does not file a motion with the Court seeking entry of an order approving the Debtor's entry into the PSA (the "Approval Order") within five business days after execution of the PSA;<br><br>3. the Court fails to enter the Approval Order within 30 days after the filing of the motion seeking approval of the Debtor's entry into the PSA;<br><br>4. the Debtor does not withdraw the currently-filed solicitation procedures motion, disclosure statement and related plan of liquidation [Doc. Nos. 255-57] on or before February 13, 2017;<br><br>5. the Debtor does not file a Plan and disclosure statement acceptable to Medpace on or before February 13, 2017;<br><br>6. the Court (i) enters an order denying confirmation of the Plan, or (ii) fails to enter an order approving the Plan on or before May 17, 2017;<br><br>7. the Plan effective date shall not have occurred by May 31, 2017;<br><br>8. the breach or noncompliance in any respect by the Debtor of (or failure to satisfy) any of the obligations, representations, warranties or covenants of the Debtor set forth in the PSA that remains uncured for five business days after the receipt by the Debtor of written notice of such breach, but solely to the extent such breach or noncompliance is materially adverse to Medpace or materially affects the ability of the Debtor or Medpace to consummate the transactions contemplated by the PSA; |

| | |
|---|---|
| | 9. the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would have a material adverse impact on the consummation of the Plan (taken as a whole);<br><br>10. the Court enters an order terminating the Debtor's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; and<br><br>11. exercise by the Debtor of its "fiduciary out" as debtor-in-possession as provided for in Sections 4.2 and 6.2 of the PSA.<br><br>See PSA at § 6.1. |
| Debtor Termination Events | The Debtor may terminate its obligations and liabilities under the PSA upon three business days prior written notice upon the occurrence of any of the following events:<br><br>1. the breach or noncompliance by Medpace of (or failure to satisfy) any of the obligations, representations, warranties, or covenants of Medpace set forth in the PSA that remains uncured for five business days after the receipt by Medpace of written notice of such breach, but solely to the extent such breach or noncompliance is materially adverse to the Debtor or materially affects the ability of the Debtor or Medpace to consummate the transactions contemplated by the PSA;<br><br>2. the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would have a material adverse impact on the consummation of the Plan (taken as a whole); or<br><br>3. the Debtor's determination that proceeding with the transactions contemplated by the PSA would be inconsistent with the continued exercise of its fiduciary duties or would otherwise violate applicable law.<br><br>See PSA at § 6.2. |
| Certain Acknowledgements of the Parties Regarding Fiduciary Duties | (a) the PSA shall not be construed to limit exercise by the Debtor or any member of the Debtor's board of directors of their fiduciary duties to any person or entity, including but not limited to those arising from the Debtor's status as a debtor or debtor-in-possession under the Bankruptcy Code or under other applicable law; |

| | |
|---|---|
| | (b) Medpace has no fiduciary duty or other duties or responsibilities to the Debtor, except as expressly provided in the PSA or in the Term Sheet; and (c) Medpace has no fiduciary duty or other duties or responsibilities to any of the Debtor's creditors. See PSA at § 9.10. |
| Specific Performance | The PSA is intended as a binding commitment enforceable in accordance with its terms against the parties thereto. It is understood and agreed by each of the parties that money damages would not be a sufficient remedy for any breach of the PSA, and each non-breaching party shall be entitled to specific performance and injunctive relief or other equitable relief as remedy of any such breach. See PSA at § 9.15. |
| Automatic Stay | The parties acknowledge that the giving of notice or termination by any party pursuant to the PSA shall not be violation of the automatic stay of section 362 of the Bankruptcy Code. Specifically, the Debtor acknowledges and agrees and shall not dispute that the giving of notice of termination by Medpace pursuant to the PSA shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtor waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice). See PSA at § 9.17. |

## RELIEF REQUESTED

17. By the Motion, the Debtor seeks entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing the Debtor to enter into the PSA with Medpace.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

18. The Debtor seeks authority to enter into the PSA pursuant to section 363(b)(1) of the Bankruptcy Code. That section provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that the debtor show "a sound business purpose justifies such actions." In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

19. Once a debtor has articulated a sound business purpose, "the law vests a debtor's decision to use property out of the ordinary course of business with a 'strong presumption' that corporate business decisions are made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re 1031 Tax Group, LLC, No. 07-11448 (MG), 2007 WL 2085384, *5 (Bankr. S.D.N.Y. 2007) (citing Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992)); see also In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005) (stating that "the business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company" and stating further that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"). This presumption "shields corporate decision makers and their decisions from judicial second-guessing." Integrated Res., 147 B.R. at 656 (internal citation omitted).

20. This Court previously has upheld the general validity of post-petition plan support agreements in In re Indianapolis Downs, LLC, 486 B.R. 286 (Bankr. D. Del. 2013). As the Court explained, there is no *a priori* prohibition in the Bankruptcy Code on plan support agreements "[w]hen [the] deal is negotiated in good faith between a debtor and sophisticated

parties, and that arrangement is memorialized a written commitment and promptly disclosed." Id. at 296.

21. Courts have looked to In re Innkeepers USA Trust, 442 B.R. 227 (Bankr. S.D.N.Y. 2010) for an illustrative list of five factors to be considered in determining whether to authorize a debtor to enter into a specific plan support agreement. Those five factors are: (a) whether the plan support agreement resulted from good-faith, disinterested, arm's-length negotiations; (b) whether the debtor is exercising due care in entering into the plan support agreement; (c) whether the plan support agreement provides value to the estate and the chapter 11 process; (d) whether the benefits of the plan support agreement outweigh the burdens; and (e) whether the plan support agreement contains a "fiduciary out." See id. at 231-35.

22. The Debtor submits that each of these five factors is met here. First, the PSA is the result of extensive, arm's-length negotiations between the Debtor and Medpace, each of which was represented by sophisticated and able counsel. Second, the Debtor has exercised due care in entering into the PSA: the Debtor has explored all other opportunities to maximize the value of the estate and the only reasonable alternative to the plan contemplated by the PSA is the Liquidating Plan, which plan would provide a lower recovery to the Debtor's unsecured creditors. Third, the PSA provides significant value to the estate by exchanging the Medpace Claim in the amount of $4,312,698.51 for 100% of the equity in the Reorganized Debtor, and thereby substantially increases the percentage recovery of all other unsecured creditors of the estate. Fourth, the only harm that could befall the estate by entering into the PSA is delay in confirming a chapter 11 plan, thereby increasing administrative costs and decreasing the funds available for distribution to creditors of the estate. However, because the PSA provides for specific performance, the likelihood that the plan contemplated by the PSA will not be

consummated by Medpace is minimized. Therefore the benefit to the estate in entering into the PSA clearly outweighs any potential harm. Finally, the PSA contains an explicit fiduciary out and reserves entirely to the Debtor the right to determine if its fiduciary duties require that it abandon the PSA.

23. As set forth above, the Debtor believes that there are significant business justifications for entering into the PSA. In particular, the Debtor believes that the plan of reorganization contemplated in the PSA and Term Sheet will result in the creditors of the estate receiving a greater distribution on account of their claims—between 39.4% to 57.7%—than they are projected to receive under the Debtor's Liquidating Plan, or is otherwise possible under the circumstances of this case.

24. As a result, the Debtor submits that entering into the PSA is in the best interests of the Debtor, its estate and its creditors.

## NO PRIOR REQUEST

25. No previous request for the relief sought herein has been made to this or any other court.

## REQUEST FOR WAIVER OF STAY

26. The Debtor requests a waiver of any stay of the effectiveness of the order approving the relief requested in the Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtor submits that, here, where the parties must move forward quickly with the filing of a plan of reorganization and related disclosure statement in order to meet the deadlines imposed by the PSA (which are necessary to conserve the limited funds available in the Debtor's

estate), the order authorizing the Debtor's entry into the PSA must be immediately effective to avoid unnecessary delay. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that such rule applies.

## NOTICE

27. Notice of the Motion will be given to: (i) the U.S. Trustee; (ii) Medpace; (iii) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; and (iv) all parties entitled to notice pursuant to Del. Bankr. L.R. 2002-1(b). The Debtor submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
February 1, 2017

COLE SCHOTZ P.C.

/s/ David R. Hurst
David R. Hurst (I.D. No. 3743)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

– and –

Jacob S. Frumkin
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

*Counsel for Debtor and*
*Debtor-in-Possession*