**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NephroGenex, Inc.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No.: 16-11074 (KG) |

**AFFIDAVIT OF PUBLICATION OF NOTICE OF (A) CONFIRMATION HEARING WITH RESPECT TO PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR AND (B) RELATED OBJECTION DEADLINE**

This Affidavit of Publication includes the sworn statement verifying that the Notice of (a) Confirmation Hearing with Respect to Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtor and (b) Related Objection Deadline [Docket No. 371] was published and incorporated by reference herein as follows:

1. In *New York Times* on March 29, 2017, attached hereto as **Exhibit A**.

[1] The last four digits of the Debtor's federal tax identification number are 5171. The mailing address for the Debtor is 3200 Beechleaf Court, Suite 900, Raleigh, NC 27604.

# Exhibit A



The New York Times
620 8TH AVENUE - NEW YORK, NY 10018

# PROOF OF PUBLICATION

MARCH 29 2017

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

MAR 29 2017 B2 NATIONAL

Alice Weber

Sworn before me the 29th day of March, 2017

Michelle M Scibilia

Notary Public

MICHELLE MARY SCIBILIA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SC6281145
Qualified In Nassau County
My Commission Expires May 13, 2017

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: NEPHROGENEX, INC., Debtor.[1] | ) | Chapter 11 Case No. 16-11074 (KG) |

**NOTICE OF (A) CONFIRMATION HEARING WITH RESPECT TO PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR AND (B) RELATED OBJECTION DEADLINE**

PLEASE TAKE NOTICE that:

On February 17, 2017, the debtor and debtor-in-possession in the above-captioned case (the "Debtor") filed the Plan Of Reorganization Pursuant To Chapter 11 Of The Bankruptcy Code Proposed By The Debtor (as may be amended, supplemented or otherwise modified, the "Plan"), pursuant to and as described in the corresponding disclosure statement (the "Disclosure Statement"), with the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Capitalized terms used in this Notice which are not defined have the meanings set forth in the Plan.

On March 23, 2017, the Bankruptcy Court entered an order [Docket No. 370] (the "Solicitation Procedures Order") approving the Disclosure Statement [Docket No. 367], establishing certain deadlines, approving voting procedures and granting related relief.

The hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held before the Honorable Kevin Gross, U.S. Bankruptcy Court for the District of Delaware, 824 N. Market St., 6th Fl., Courtroom No. 3, Wilmington, DE 19801, on **May 10, 2017 at 10:00 a.m. (Eastern Time)**. The Confirmation Hearing may be continued from time to time by way of announcement of such continuance in open court, without further notice to parties in interest.

Parties in interest may object to confirmation of the Plan, whether or not such parties in interest are entitled to vote on the Plan. Responses and objections, if any, to confirmation of the Plan must (a) be made in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules and the Local Rules; (c) state the name and address of the objecting party and the nature and amount of any claim or interest asserted by such party against the Debtor, its estate or property; (d) state with particularity the legal and factual bases and nature of any objection to the Plan; and (e) be filed with the Bankruptcy Court, and served on the following, so as to be received **on or before 4:00 p.m. (Eastern Time) on April 27, 2017**: (i) Debtor's counsel, Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn: David R. Hurst, Esq. (dhurst@coleschotz.com); and (ii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Mark Kenney, Esq. (mark.kenney@usdoj.gov). Objections that are not timely filed shall not be considered by the Bankruptcy Court and shall be overruled.

**Articles X.D and X.E of the Plan provide for releases, exculpation and injunctions of certain conduct. Among other things, Article X.E of the Plan permanently enjoins persons and entities that held, hold or may hold or have asserted, assert or may assert claims against or interests in the Debtor or its estate, from taking various actions with respect to such claims or interests.**

The Disclosure Statement, Plan and Solicitation Procedures Order may be examined by any party in interest: (i) between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Court, 824 N. Market St., 3rd Fl., Wilmington, DE 19801; (ii) at the Debtor's case website (http://www.kccllc.net/nephrogenex); or (iii) at the Bankruptcy Court's website (http://www.deb.uscourts.gov) (a PACER account is required); or may be obtained by written request to Kurtzman Carson Consultants LLC ("KCC"), at nephrogenexinfo@kccllc.com, or by telephoning KCC at (888) 733-1437.

**If you have any questions regarding this Notice, please contact KCC at (888) 733-1437, or by email at nephrogenexinfo@kccllc.com. KCC is not permitted to provide legal advice.**

COLE SCHOTZ P.C., David R. Hurst, 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 -and- Jacob S. Frumkin, 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, *Counsel for Debtor and Debtor-in-Possession*

[1] The last four digits of the Debtor's federal tax identification number are 5171. The mailing address for the Debtor is P.O. Box 400, Jamison, Pennsylvania 18929.

# Equal Pay for Women? Iceland Says Prove It

*From First Business Page*

may speed progress in other areas. The global gender pay gap will not close for 70 years unless such efforts accelerate, according to the International Labor Organization.

The proposed legislation follows an equal pay pilot program in which government bodies and companies identified chronic hurdles that block women from higher-paying jobs: Women occupy different professions from men and fewer high-level positions, contributing to lower pay. Some employers in the program are now seeking to hire more women for jobs traditionally held by men.

Ms. Valdimarsdottir, the women's rights advocate, quit her home-care job for the municipality of Reykjavik.

She had discovered that an accountant for the municipality was paid four times as much as Ms. Valdimarsdottir was for her management role overseeing a 10-person team providing home care services, comprising mostly women. Later, the city adjusted the salary for her former position to be nearly equal with the accountant's, and raised salaries for the other workers.

Many Icelandic companies already embrace a voluntary equal pay standard forged by business organizations and labor unions. But business groups say it should not be imposed, particularly given the administrative burden of compliance, especially for small firms.

"Companies should do this for their own benefit and the benefit of their employees," said Halldor Thorbergsson, the director general for the Confederation of Icelandic Employers. "But it should not be legalized."

Businesses in other countries are also wary of government intervention, including in Britain, which recently required companies with 250 employees or more to publicly report their gender pay differences. Austria and Belgium have similar rules. In the United States and Switzerland, federal contractors must report wage information by gender to the government.

Icelandic women have long argued that equality needs a national push.

In 1974, 90 percent of women walked off jobs and out of their homes to show how society would be affected if they did not work. That watershed moment soon led to the world's first democratically elected female president, Vigdis Finnbogadottir, in 1980.

Today, about half of Iceland's Parliament members are women. Nearly 80 percent of women work and, with a gender quota in place, almost half of company board members are women.

Yet many women still have less economic power than men. Top level and intermediate managers are mostly men, and the pay gap is especially persistent for working mothers and women in female-dominated fields.

The new rules would require the biggest companies and government agencies to undergo audits, starting in 2018, and to obtain a certification of compliance with equal pay rules. Businesses with over 25 employees must comply by 2022.

Employers must assess every job, from cleaner to senior executive, to identify and fix wage gaps of more than 5 percent.

Although the process requires time and money, Arni Kristinsson, the managing director of BSI Iceland, a standards auditor that performs some of the fair pay reviews, said those costs were not insurmountable.

"The question is, are companies committed?" he said. "At firms that are, we are already seeing the pay gap narrow" to as little as 3 percent.

The audits revealed other workplace inequalities linked to pay. At the Icelandic Customs agency, which participated in the pilot program, officials found that salaries were lower when women were employed as a large group.

BARA KRISTINSDOTTIR FOR THE NEW YORK TIMES

The Icelandic customs agency is trying to recruit more men for the tax department, above, and more women to become agents.

About 80 percent of Iceland's uniformed customs agents are men, a group paid 30 percent more than customs tax collectors, who are mostly women. The agents work longer hours and face challenges like inspecting cargo for drugs, so the review found the pay system was justified, said Snorri Olsen, Iceland's Customs director. But the review also spurred a reassessment of the gender balance in each group.

The agency is now trying to recruit more men for office work and more women into the higher-paid

**Employers would have to fix wage gaps of over 5 percent.**

agent jobs, partly by shortening shifts to accommodate women who have child care demands, Mr. Olsen said.

"There's a tendency to look at work usually done by men as more valuable," he said. "This is technically a discussion of equal pay, but it's really a question about equality in our society."

The audits help promote self-reflection, even among female managers, about the potential for unconscious bias anywhere.

At a Reykjavik-based ad agency called the White House, Anna Kristin Kristjansdottir, a board member and owner, said the equal pay audit revealed leanings in the 45-person work force, including the proportion of higher-level jobs held by men. Like the Customs agency, she is seeking to even the percentages, especially in upper management, where she aims to achieve gender parity.

Whether such adjustments work are debatable. Some studies show pay gaps between men and women reside largely within occupations, not between them.

Equally disturbing to Ms. Kristjansdottir was that women negotiated lower salaries than men. Generally, men are four times as likely to ask for a raise, and when women ask, they seek 30 percent less on average.

"You'd be sitting there doing the interview, and they'd ask for less," Ms. Kristjansdottir said. "The audit showed this was a flaw in our recruitment, that we were allowing this to happen and didn't quite realize it."

For Mr. Viglundsson, the government official, the fact that larger equality issues surface in the debate over equal pay is justification enough for the legislative proposal.

"When it comes to the workplace, men have enjoyed a certain level of privilege for a long time," he said. "But if you look at the vested interests for society of eliminating discrimination against women, that far outweighs any regulatory burden."

# *Trump's Diagnosis? On Target. The Cure? Badly Misguided.*

*From First Business Page*

income families pay for heating in the winter or move to better neighborhoods; cutting nutrition assistance for mothers and help for low-income students to enter college.

Indeed, his initial forays into social and economic policy making raise an uncomfortably raw question: Was his appeal to the troubled working class a con? If anything, his proposals look like a scheme to make the carnage worse.

Last week, the Princeton economists Anne Case and Angus Deaton unveiled new research offering a bleak portrait of Mr. Trump's base of white men and women without a bachelor's degree: They are, indeed, dying in droves, committing suicide and poisoning themselves with drugs and alcohol at much higher rates than blacks, Hispanics, or men and women in other advanced countries.

"Deaths of despair," Professors Case and Deaton call them. From 1998 through 2015, the mortality rate of white non-Hispanic men and women with no more than a high school diploma increased in every five-year age group, from 25-to-29 to 60-to-64, they found.

The desperation took time to build — 40 or 50 years maybe, as automation and globalization killed jobs on the factory floor. Squeezed into insecure, low-wage jobs in the service sector, many workers lacking the higher education required to profit from the new economy simply left the job market.

Others soldiered on. But the changes nonetheless took their toll. Marriage declined and families weakened. The prospects of working-class children deteriorated. And successive governments, Republican and Democratic, avoided looking too hard at the plight of modernity's losers.

These economic changes affected all workers with scant education, of course. But whites suffered a deeper blow: In 1999 mortality rates of whites with no college were around 30 percent lower than those of blacks as a whole, Professors Deaton and Case found. By 2015 they were 30 percent higher. It seems that blacks and Latinos, whose memories of the halcyon days of manufacturing in the early 1970s are colored by the stain of discrimination, suffered less of a loss.

This is hardly a fitting picture for one of the most affluent societies in human history. But there you go. Other research has documented how mortality has declined more slowly for less-educated Americans over the last 20 to 25 years. From 1990 to 2008 the life expectancy of white men and women without a high school degree decreased.

They are, in fact, killing themselves. One study published in 2004 found that the mortality rate of adults with only a high school education for causes that were tough to prevent — like multiple sclerosis and cancer of the gallbladder — was no higher than for adults with a bachelor's degree. But it was about 25 percent higher for highly preventable causes of death — like homicides, lung cancer and accidents.

Mr. Trump doesn't have it entirely wrong when he blames trade for this. In a study published last month, the economists David Autor, David Dorn and

NICK COTE FOR THE NEW YORK TIMES

Trump supporters during a rally in February at the Colorado State Capitol in Denver.

Gordon Hanson found that shocks that reduced job opportunities for less-educated Americans, such as that delivered by the surge of imports from China since 2000, unleashed an array of unhealthy responses.

These include: "an increase in the rate of male mortality from risky and unhealthful behaviors; a reduction in the net availability of marriage-age males in affected labor markets; a reduction in the fraction of young adults entering marriage; a fall in fertility accompanied by a rise in the fraction of births to teen and unmarried mothers; and a sharp jump in the fraction of children living in impoverished and, to a lesser degree, single-headed households."

***Cutting benefits and training won't help working-class whites.***

Can Mr. Trump do anything for these people? A lot of them voted for him.

Perhaps he has come to believe, as do so many on the Republican right, that American carnage is the government's fault: Welfare itself has corrupted the poor. So best to cut welfare programs to pay for another round of tax cuts.

As I suggested in a recent column, perhaps he is banking on the white working class's resentment of poor people, whom they see as moochers entitled to government aid not available to their own struggling families. From a narrow political standpoint, forgetting about his base seems like a counterproductive course to follow.

Mr. Trump's most prominent campaign proposals — which promised to restore the jobs and the demographics of the 1950s and 1960s by blocking imports and kicking out millions of immigrants — are, of course, unrealistic. A more ethnically diverse America is here to stay. The labor-intensive manufacturing sector will not return to the United States no matter what the president does.

"The trouble with protectionism is that it is not going to bring those jobs back," Professor Deaton told me. "We can spend a huge amount of money inflicting pain on ourselves, not to mention Chinese and Indian and other people much poorer than we are, and not get anything back."

But there are more productive ideas around. It is too early for Mr. Trump to simply fold on his promises of a better future for the white working class. Republicans' failure to approve the plan to end the Affordable Care Act — devised by the House speaker, Paul D. Ryan, and endorsed by the president — offers an opportunity to correct course.

Why not extend the social safety net to cover his distressed voters, offering a lifeline of stability to help them hang on to their lives? This could include training programs to help less-educated workers find new careers in an unstable economy, extended unemployment benefits, or wage subsidies for workers knocked down into jobs with low pay. Even, perhaps, something more generous: truly universal health insurance.

There are real political benefits to this strategy. Mike Konczal of the Roosevelt Institute, a progressive research group, pointed out how, by expanding public health insurance for the poor to cover the working class, the Affordable Care Act created a broader coalition to stop the Republicans' repeal effort. Public health, he wrote, "was transformed away from a 'poor program for poor people' to a broader program in the popular imagination, one that becomes easier for the political class to defend."

The party the president represents may not like these sorts of proposals. But the relationship is fractious anyway. He was elected to fix the carnage.

*Email: eporter@nytimes.com; Twitter: @portereduardo*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| **SunEdison, Inc., *et al*** | ) | **Case No. 16-10992** |
| **Debtors.[1]** | ) | **Jointly Administered** |

**NOTICE OF DEADLINES FOR SUBMITTING PROOFS OF CLAIM AND REQUESTS FOR PAYMENT UNDER BANKRUPTCY CODE SECTION 503(b)(9) AGAINST THE SECOND BAR DATE DEBTORS**

**PLEASE TAKE NOTICE THAT** on March 22, 2017, the Court entered an order approving the *Debtors' Motion for Entry of an Order (a) Establishing Deadlines for Submitting Proofs of Claim and Requests for Payments under Bankruptcy Code Section 503(b)(9); (b) Approving the Form and Manner of Submitting Such Proofs of Claim and Requests for Payment; (c) Approving the Notice Thereof* (Docket No. 2627) (the "Second Bar Date Order") in the above-captioned cases. A copy of the Second Bar Date Order can be accessed at the Debtors' restructuring website, https://cases.primeclerk.com/sunedison/Home-Index.

The Second Bar Date Order requires all entities (the "Claimants") holding or wishing to assert a claim that arose or is deemed to have arisen prior to the Petition Date (the "Claims") against one or more of the debtors listed in the table below (the "Second Bar Date Debtors") to submit a proof of claim ("Proof of Claim") so as to be actually received by Prime Clerk, LLC. ("Prime Clerk"), the Debtors' claims and noticing agent, on or before a certain date (the "Second Bar Dates"). The table below lists the Second Bar Date Debtors and the Second Bar Dates:

**Second Bar Date Debtors.** The Second Bar Date Debtors, along with the last four digits of each Debtor's tax identification number include: Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993).

**Second General Bar Date (applicable to 503(b)(9) claims).** All Claimants, other than governmental units, holding or wishing to assert a Claim must submit proof of such Claim so as to be actually received by Prime Clerk by May 4, 2017 at 5:00 p.m. prevailing Eastern Time (the "Second General Bar Date"). Requests for payment under Bankruptcy Code section 503(b)(9) must also be submitted so as to be actually received by Prime Clerk by the Second General Bar Date.

**Second Governmental Bar Date.** All governmental units holding or wishing to assert a Claim must submit proof of such Claim so to be actually received by June 14, 2017 at 5:00 p.m. prevailing Eastern Time (the "Second Governmental Bar Date").

**Second Amended Schedules Bar Date.** In the event a Second Bar Date Debtor amends or supplements its schedules of assets and liabilities (collectively, the "Schedules") to reduce, delete, change the classification of, or add a Claim, the Second Bar Date Debtors shall give notice of any such amendment to the holders of any Claim affected thereby, and such holders shall be afforded the later of thirty (30) days from the date on which such notice is given or the Second General Bar Date or Second Governmental Bar Date, as applicable, to submit a Proof of Claim with respect to such amended Claim (the "Second Amended Schedules Bar Date") or be forever barred from doing so.

**Second Rejection Bar Date.** Claimants must file a proof of claim arising from a Second Bar Date Debtor's rejection of any executory contract or unexpired lease by the later of the Second General Bar Date or 5:00 p.m., prevailing Eastern Time, on the date that is 30 days after the entry of the relevant Rejection (the "Second Rejection Bar Date").

**Filing a Proof of Claim**. All Proofs of Claim must be submitted so as to be **actually received** no later than 5:00 p.m. prevailing Eastern Time on the applicable Second Bar Date at the following address: **IF BY MAIL:** SunEdison, Inc. Claims Processing Center, c/o Prime Clerk, LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022; **IF DELIVERED BY HAND:** United States Bankruptcy Court, Southern District of New York, One Bowling Green, Room 534, New York, NY 10004-1408; **IF FILED ELECTRONICALLY:** http://cases.primeclerk.com/sunedison/EPOC-Index.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

**Contents of Proofs of Claim**. Each Proof of Claim must: (i) be written in English; (ii) include a Claim amount denominated in United States dollars; (iii) conform substantially with the Proof of Claim Form provided by the Debtor or Official Form 410; (iv) state a Claim against a Second Bar Date Debtor; (v) be signed by the Claimant or if the Claimant is not an individual, by an authorized agent of the Claimant; and (vi) include supporting documentation (or, if such documentation is voluminous, include a summary of such documentation) or an explanation as to why such documentation is not available.

**Consequences of Failing to Timely Submit Your Proof of Claim**. **Any Claimant who is required, but fails, to submit a Proof of Claim in accordance with the Second Bar Date Order on or before the applicable Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Second Bar Date Debtors, their property, or their estates (or filing a Proof of Claim with respect thereto), and the Second Bar Date Debtors, their property, and their estates shall be forever discharged from any and all indebtedness or liability with respect to such Claim, and such holder shall not be permitted to vote, to accept or reject any plan of reorganization filed in the chapter 11 case, or participate in any distribution on account of such Claim or receive further notices regarding such Claim.**

**Reservation of Rights**. Nothing contained in this notice is intended to or should be construed as a waiver of the Second Bar Date Debtors' right to: (a) dispute, or assert offsets or defenses against, any filed Claim or any Claim listed or reflected in the Schedules as to the nature, amount, liability or classification thereof; (b) subsequently designate any scheduled Claim as disputed, contingent or unliquidated; and (c) otherwise amend the Schedules.

**Additional Information**. If you have any questions regarding the claims process and/or if you wish to obtain a copy of the Second Bar Date Order (which contains a more detailed description of the requirements for filing proofs of claim), a proof of claim form or related documents you may do so by contacting Prime Clerk at: (a) (855) 388-4575; (b) the Debtors' restructuring website https://cases.primeclerk.com/sunedison/Home-Index. Please note that Prime Clerk cannot advise you how to file, or whether you should file, a Proof of Claim.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream Holdco Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: NEPHROGENEX, INC., | ) | Chapter 11 |
| Debtor.[1] | ) | Case No. 16-11074 (KG) |

**NOTICE OF (A) CONFIRMATION HEARING WITH RESPECT TO PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR AND (B) RELATED OBJECTION DEADLINE**

PLEASE TAKE NOTICE that:

On February 17, 2017, the debtor and debtor-in-possession in the above-captioned case (the "Debtor") filed the Plan Of Reorganization Pursuant To Chapter 11 Of The Bankruptcy Code Proposed By The Debtor (as may be amended, supplemented or otherwise modified, the "Plan"), pursuant to and as described in the corresponding disclosure statement (the "Disclosure Statement"), with the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Capitalized terms used in this Notice which are not defined have the meanings set forth in the Plan.

On March 23, 2017, the Bankruptcy Court entered an order [Docket No. 370] (the "Solicitation Procedures Order") approving the Disclosure Statement [Docket No. 367], establishing certain deadlines, approving voting procedures and granting related relief.

The hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held before the Honorable Kevin Gross, U.S. Bankruptcy Court for the District of Delaware, 824 N. Market St., 6th Fl., Courtroom No. 3, Wilmington, DE 19801, on **May 10, 2017 at 10:00 a.m. (Eastern Time)**. The Confirmation Hearing may be continued from time to time by way of announcement of such continuance in open court, without further notice to parties in interest.

Parties in interest may object to confirmation of the Plan, whether or not such parties in interest are entitled to vote on the Plan. Responses and objections, if any, to confirmation of the Plan must (a) be made in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules and the Local Rules; (c) state the name and address of the objecting party and the nature and amount of any claim or interest asserted by such party against the Debtor, its estate or property; (d) state with particularity the legal and factual bases and nature of any objection to the Plan; and (e) be filed with the Bankruptcy Court, and served on the following, so as to be received **on or before 4:00 p.m. (Eastern Time) on April 27, 2017**: (i) Debtor's counsel, Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn: David R. Hurst, Esq. (dhurst@coleschotz.com); and (ii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Mark Kenney, Esq. (mark.kenney@usdoj.gov). Objections that are not timely filed shall not be considered by the Bankruptcy Court and shall be overruled.

**Articles X.D and X.E of the Plan provide for releases, exculpation and injunctions of certain conduct. Among other things, Article X.E of the Plan permanently enjoins persons and entities that held, hold or may hold or have asserted, assert or may assert claims against or interests in the Debtor or its estate, from taking various actions with respect to such claims or interests.**

The Disclosure Statement, Plan and Solicitation Procedures Order may be examined by any party in interest: (i) between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Court, 824 N. Market St., 3rd Fl., Wilmington, DE 19801; (ii) at the Debtor's case website (http://www.kccllc.net/nephrogenex); or (iii) at the Bankruptcy Court's website (http://www.deb.uscourts.gov) (a PACER account is required); or may be obtained by written request to Kurtzman Carson Consultants LLC ("KCC"), at nephrogenexinfo@kccllc.com, or by telephoning KCC at (888) 733-1437.

**If you have any questions regarding this Notice, please contact KCC at (888) 733-1437, or by email at nephrogenexinfo@kccllc.com. KCC is not permitted to provide legal advice.**

COLE SCHOTZ P.C., David R. Hurst, 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 -and- Jacob S. Frumkin, 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, *Counsel for Debtor and Debtor-in-Possession*

[1] The last four digits of the Debtor's federal tax identification number are 5171. The mailing address for the Debtor is P.O. Box 400, Jamison, Pennsylvania 18929.

# *With 5% Stake, Tencent Joins Tesla's Largest Shareholders*

By CHAD BRAY

Tencent Holdings, one of China's internet giants, has acquired a 5 percent stake in Elon Musk's electric-car maker Tesla, according to a filing with the United States Securities and Exchange Commission on Tuesday.

The purchase of 8.17 million shares makes the Chinese company one of Tesla's largest shareholders. Tencent, whose internet empire includes businesses as diverse as online games and chat services, paid $1.8 billion for the stake, according to the filing.

Shares of Tesla rose 3 percent in early trading in New York.

The purchase came as Tesla has recently sought to raise more cash before it begins production of its Model 3, an electric vehicle targeting the mass market.

Tesla has previously focused on higher-end electric vehicles that begin around $91,000, and the introduction of the Model 3 will probably represent a significant increase in production for the carmaker. The company expects to make 5,000 Model 3s a week in the fourth quarter, and 10,000 a week at some point in 2018, according to a shareholder letter.

This month, Tesla said it would sell $250 million of common stock and $750 million of convertible senior notes.

Tencent controls WeChat, the popular messaging service in China. It also reached a deal last year to take control of Supercell, the maker of the popular Clash of Clans game.