# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| NEPHROGENEX, INC., | ) | Case No. 16-11074(KG) |
| | ) | |
| Debtor. | ) | **Re: D.I. No.** 443 |
| | ) | |

## MEMORANDUM OPINION

The Court has a fee dispute before it. The opposing parties are the fee applicant, Cassel Salpeter & Co., LLC ("CS") and the objectors, the Reorganized Debtor and Medpace, Inc. ("Medpace"), joined in their objection by Patheon Pharmaceuticals, Inc. and its affiliate DPx Fine Chemicals Austria GMbH & Co. KG (together with the Reorganized Debtor and Medpace, the "Objectors"). The Court conducted an evidentiary hearing on July 17, 2017, at which Mr. James S. Cassel ("Mr. Cassel") testified and was cross-examined. The Court is satisfied that Mr. Cassel was a knowledgeable and very credible witness. The Court will refer to Mr. Cassel's testimony but, as is often the case, the Court's decision rests primarily on the documentary evidence.[1] The Court will grant CS's request for the allowance of compensation in the amount of $518,750.00 and reimbursement of expenses in the sum of $7,002.64. The Court's reasons follow.

---

[1] The Court will cite to the hearing transcript as "Tr.," followed by the page.

**Background Facts**[2]

NephroGenex, Inc. (the "Debtor") is a clinical stage pharmaceutical company which focuses on developing therapeutics to treat kidney diseases. Debtor formulated Pyridorin® (pyridoxamine dihydrochloride) to slow the progression of diabetic neuropathy, which was subjected to a "Phase 3 Study" to evaluate the drug's safety and efficacy. Debtor's board of directors paused the Phase 3 Study on February 22, 2016.

On April 30, 2016, Debtor commenced the Chapter 11 case and thereafter sought and obtained the Court's approval of bidding procedures for the sale of substantially all of Debtor's assets. The Debtor did not receive any qualified bids by the bid deadline. Accordingly, on December 6, 2016, Debtor filed a plan of liquidation (the "Liquidation Plan"), attached to which was a projection showing that creditors would receive 26.8% to 37.1% of allowed claims.

After Debtor filed the Liquidation Plan and a disclosure statement, Medpace submitted to Debtor a draft plan term sheet which would result in a restructuring through a Chapter 11 plan of reorganization. The parties then negotiated and after several weeks Debtor and Medpace agreed upon the major terms of the plan (the "Plan") and proceeded to confirmation. The Plan will result in a recovery of approximately 49.5% of allowed claims. The Plan which the Court confirmed on May 10, 2017 (D.I. 422) provides that:

    1.    The Debtor will continue to exist after the Effective Date as the Reorganized Debtor in accordance with Delaware law and pursuant to the Reorganized NephroGenex Bylaws and Reorganized NephroGenex Certification of Incorporation;

---

[2] The background facts are uncontested and the Court will therefore not cite to the record.

2. The Liquidating Trust will be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (i) resolving all Disputed Claims and any Claim objections pending as of the Effective Date; (ii) prosecuting any objections to Claims that the Liquidating Trustee deems appropriate and resolving such objections; and (iii) making Distributions from the Liquidating Trust to Holders of Allowed Claims as provided for in the Plan and/or the Liquidating Trust Agreement;

3. The Debtor's remaining Cash will be transferred to the Liquidating Trust to fund the trust and Distributions to Creditors, and the Debtor's remaining property will vest in the Reorganized Debtor;

4. The Debtor's existing common stock will be cancelled and extinguished, and in full satisfaction, settlement, release and discharge of, and in exchange for, Medpace's Allowed General Unsecured Claim in the amount of $4,312,698.51, Medpace will receive one hundred percent (100%) of the shares of common stock of Reorganized NephroGenex; and

5. The Reorganized Debtor will retain and may (but is not required to) enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and such Causes of Action will vest in the Reorganized Debtor as of the Effective Date.

*See* Debtor's Memorandum in Support of Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed by Debtor, page 6 (D.I. 413). The Court will hereafter refer to the foregoing as the "Plan Transaction."

### CS's Retention and Work

The Debtor retained CS as its investment banker. Tr. 66. CS "is an independent investment banking firm that advises middle market and emerging growth companies." Declaration of James S. Cassel in Support of Confirmation of Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed By the Debtor ("Cassel's Dec."), ¶ 4. D.I. 412. Its services include "mergers and acquisitions, capital raising, restructuring and other financial and strategic advisory services . . . ." *Id.* Mr. Cassel, who headed the

CS firm in its engagement with the Debtor, has over twenty years of experience in investment banking and seventeen years of experience as a corporate and securities lawyer. Tr. 26. There was one objection pertaining to CS's qualifications to serve as Debtor's investment banker, but that objection was withdrawn. Tr. 67-68.

The Court approved CS's retention by Order which the Court entered on May 31, 2016. D.I. 67. The Court approved the retention pursuant to sections 327(a) and 328(a) of the Bankruptcy Code. The application for retention (D.I. 35) had as an attachment the Investment Banking Agreement, dated April 29, 2016, between Debtor and CS (the "Engagement Agreement"). Tr. 67. The fees to be paid to CS (which is the subject of the dispute and this opinion) provides for an initial fee of $137,500 and a "Sale Transaction Fee" equal to the greater of $500,000 or 3.5% of the "Sale Consideration." Engagement Agreement, Exhibit A, ¶ 5(b). Sale Transaction is defined broadly to include:

> For purposes of this Agreement, a "Sale Transaction" shall mean, any transaction or series of transactions involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which all or substantially all of the business assets, subsidiaries, divisions, business segments, operations, securities, or equity interests of the Company are, directly or indirectly, combined with another company; (b) the acquisition, directly or indirectly, by a buyer or buyers. . . of equity interests or options, or any combination thereof constituting a majority of the then outstanding economic interests in the Company or possessing a majority of the then outstanding voting power of the Company; (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of any assets, securities or other interests of the Company; or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of a controlling interest in the Company to a third party.

Engagement Agreement, ¶ 1, Tr. 70-73. The Engagement Agreement further provides that:

> Such Sale Transaction may be consummated through a Bankruptcy Code Section 363 process, through a confirmed plan of reorganization, or otherwise.

*Id.*

CS actively marketed Debtor to over 275 potential purchasers and worked more than 700 hours on Debtor's behalf. Tr. 77, 93. However, CS received instruction that it should not communicate with Medpace. Tr. 82-83. Instead, Debtor's attorneys would (and did) work with Medpace. *Id.* Eventually, the Debtor-Medpace transaction happened. CS remained active, reviewing the drafts of the term sheets for the transaction. Tr. 84.

## Analysis

The Court will allow CS its success fee. CS was retained pursuant to Section 328(a) of the Bankruptcy Code. The Retention Order provides, in part, that "the fees payable to [CS] pursuant to the Engagement Agreement shall be subject to review pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code and shall not be subject to the standards set forth in section 330 of the Bankruptcy Code . . . ." Retention Order, ¶ 4.

Section 328(a) provides, in part, that:

> [T]he court may allow compensation different from the compensation provided under such terms and conditions after conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

The Court therefore has the authority under Section 328(a) to change the terms of compensation using the "improvidence" standard.

Objectors argue that the Debtor retained CS to market and sell its assets and the Engagement Agreement called for a success fee in the event of a sale. Instead, Debtor filed the Liquidation Plan and Medpace staved off liquidation by exchanging its large claim ($4,312,698.51) for a distribution of new common stock. Objectors argue that paying CS a success fee under such circumstances would be inequitable, i.e., improvident.

Objectors also argue that the transaction in the Plan was not a sale, that the transaction does not meet the definition of a Sale Transaction in the Engagement Agreement. The transaction was not a "combin[ation] with another company." Engagement Agreement ¶ 1. Objectors also complain that the Plan Transaction did not create proceeds. The Engagement Agreement provides that "all fees and expenses due and payable to CS shall be paid directly out of the gross proceeds of any Sale Transaction. . . ." Engagement Agreement ¶ 6. The Plan Transaction created no proceeds. Objectors thus argue that because the new common stock was issued in exchange for Medpace's claim and not in exchange for the old common stock, therefore there were no "proceeds."

It is important to remember that the definition of "Sale Transaction" includes "an acquisition, merger, consolidation, or other business combination" combining the Debtor, "directly or indirectly" with another company. It is clear to the Court that by virtue of the Plan Transaction, Medpace now owns all of the equity of the Reorganized Debtor.

The Plan Transaction is therefore a combination, "direct or indirect" between the Debtor and Medpace.  *See* Engagement Agreement ¶ 1(a).

Similarly, the Engagement Agreement defines "Sale Transaction" as "the acquisition . . . of equity interests . . . constituting a majority of the then outstanding economic interests in the [Debtor] or possessing a majority of the then outstanding voting power of the [Debtor]."  Engagement Agreement ¶ 1(b).  Medpace acquired all of the Reorganized Debtor's equity through the Plan Transaction and therefore the Plan Transaction qualifies as a "Sales Transaction."

Likewise, the Engagement Agreement contains a provision involving "any other purchase or acquisition, directly or indirectly, by a buyer or buyers of any assets, securities or other interests of this [Debtor]."  Engagement Agreement ¶ 1(c).  Once again, it is clear that the Plan Transaction qualifies as a "Sales Transaction" under ¶ 1(c).  Objectors' arguments are misplaced.  A Sale Transaction occurred because Medpace acquired all of the Debtors' equity and assets.  While Objectors argue that Medpace received equity in the Reorganized Debtor and not the Debtor, the Plan and the Confirmation Order explicitly provide that the Debtor continued to exist and issued the new equity to Medpace.  *See* Confirmation Order, ¶¶ 23 and 25; and the Plan, Art. V. A.1 and 4.  The Court therefore finds that a Sale Transaction occurred pursuant to the Engagement Agreement ¶ 1(c).

Finally, Objectors argue that CS is not entitled to a success fee because the Plan Transaction did not generate proceeds with which to pay the fee.  Objectors point to the Engagement Agreement, ¶ 6, which provides, in part, that "CS shall be paid directly out

7

the gross proceeds of any Sale Transaction regardless of the existence of any unpaid administrative claims." The Plan Transaction created no proceeds and "proceeds" means "money" received. The Objectors make the foregoing argument and cite *Magna Entm't Corp. v. PA Meadows, LLC* (*In re Magna Entm't Corp.*), 442 B.R. 88, 93-94 (Bankr. D. Del. 2011). Furthermore, according to the Objectors, the Engagement Agreement uses the terms "paid" and "proceeds" closely together which makes the point that proceeds must be created before there is any payment. The Objectors' argument appears to make sense, *viz.*, no money, no success fee. The argument, however, is overly simplistic and does not control. First, the Engagement Agreement does not limit the payment of the Sale Transaction Fee to results in cash proceeds. The Engagement Agreement does not provide that the Sales Transaction Fee can only be paid if the Sales Transaction generates cash. More importantly, the Engagement Agreement defines "Sale Consideration" to include "(y) the principal amount of all indebtedness for borrowed money or other liabilities of the [Debtor] or [Debtor] related entity as applicable, as set forth on the most recent balance sheet, or in the case of a sale of assets, all indebtedness for borrowed money or other liabilities assumed, cancelled, exchanged, or forgiven by a third party. . . ." Engagement Agreement, Ex. A, Section (A)(y). The Plan Transaction meets the definition. The money necessary to pay the CS fee will come from the Reorganized Debtor's cash on hand.

**Conclusion**

The Court has carefully reviewed the arguments presented and read the Plan Transaction, the Engagement Agreement and the Retention Order and concludes for all the foregoing reasons that CS has earned its success fee. The Court will issue an Order consistent with this Memorandum Opinion.

Dated: July 26, 2017

_____
KEVIN GROSS, U.S.B.J.